DA 11-0413

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 318

REBECCA E. MATTSON, et al.,

      Plaintiffs and Appellants,

    v.

MONTANA POWER COMPANY, PPL MONTANA, LLC,
TOUCH AMERICA HOLDINGS, INC., MONTANA POWER LLC,
a/k/a NORTHWESTERN ENERGY, and NORTHWESTERN CORPORATION,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV-99-548(A)
Honorable Katherine R. Curtis, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          James H. Goetz (argued), Goetz, Gallik & Baldwin, P.C.,
Bozeman, Montana

          Calvin T. Christian, Christian, Samson, Jones & Chisholm,
Missoula, Montana

          Jamie S. Franklin, The Franklin Law Firm, LLC, Chicago, Illinois

          Larry Elison, Attorney at Law, Gold Canyon, Arizona

          Thomas R. Meites, Michael M. Mulder, Meites, Mulder & Glink,
Chicago, Illinois

      For Appellee Montana Power Company:

          Joseph Seifert, Keller, Reynolds, Drake, Johnson & Gillespie, P.C.,
Helena, Montana

          David A. Dial, Nicholas P. Panayotopoulos, Michael Sexton, Kristen L.
Henrichs, Emily A. Poe, Weinberg, Wheeler, Hudgins, Gunn & Dial,
Atlanta, Georgia

For Appellee PPL Montana, LLC:

Martin S. King, Sean Morris (argued), Worden Thane, P.C.,
Missoula, Montana

Argued and Submitted:  May 9, 2012

Decided:  December 27, 2012

Filed:

_____
Clerk

2

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Plaintiffs are a group of landowners or former landowners with properties on the shores of Flathead Lake and a portion of the upper Flathead River (Landowners). They commenced the instant action in 1999 in the Eleventh Judicial District Court, Flathead County, against Montana Power Company (MPC) and MPC's successor, PPL Montana, LLC (PPLM).

¶2 The present appeal is the third in the course of this litigation. In *Mattson v. Mont. Power Co.*, 2002 MT 113, 309 Mont. 506, 48 P.3d 34 (*Mattson I*), this Court upheld the District Court's denial of PPLM's motion to substitute the District Court judge. In *Mattson v. Mont. Power Co.*, 2009 MT 286, 352 Mont. 212, 215 P.3d 675 (*Mattson II*), this Court reversed a portion of the District Court's order granting summary judgment in favor of the defendants, vacated the District Court's orders concerning class certification, and remanded for further proceedings.

¶3 On remand, the District Court denied Landowners' renewed motion for class certification. The sole issue in this appeal is whether the District Court erred in its application of *Mattson II* to the class-certification question under Rule 23 of the Montana Rules of Civil Procedure. We conclude that the District Court did so err. We therefore reverse and remand with instructions to certify the class, as specified below, and for further proceedings consistent with this Opinion.

## BACKGROUND

¶4 Flathead Lake is located in northwest Montana. Covering 191 square miles, it is the largest natural freshwater lake west of the Mississippi. Its two primary tributaries are

the upper Flathead River and the Swan River, which enter from the north and east. The lake drains to the south into the lower Flathead River.

¶5 In 1930, the Federal Power Commission issued Rocky Mountain Power Company (RMPC, a subsidiary of MPC) a 50-year license to construct and operate a dam on the lower Flathead River. RMPC transferred the license to MPC in 1938. Construction of the dam (Kerr Dam) began in 1930 but then was delayed due to the Great Depression. It was finally completed in 1938, and commercial operations began in 1939. The dam is located on the lower Flathead River 4.5 miles downstream of the lake's natural outlet. It regulates the lake's water level and generates electrical power for customers in Montana.

¶6 In 1976 (four years before the original 50-year license expired), MPC and the Confederated Salish and Kootenai Tribes of the Flathead Reservation filed competing applications for a new license to operate the Kerr Project (the dam, the reservoir, and appurtenant facilities). They eventually reached a settlement under which a new 50-year license would issue to MPC and the Tribes jointly, and MPC would hold and operate the project for the first 30 years (i.e., until 2015), at which point the Tribes would have the option of taking over the project. The Federal Energy Regulatory Commission issued the joint license in July 1985. MPC continued to manage and operate the project until 1999, when it conveyed its interest to PPLM. PPLM has operated the dam since.

¶7 Flathead Lake is fed by snowmelt and by releases from Hungry Horse Dam.[1] Prior to the construction of Kerr Dam, the lake's water level rose an average of eight feet

---

[1] Hungry Horse Dam is located northeast of the lake on the South Fork of the upper Flathead River. It was completed in 1953.

each year from mid-April to early June due to spring runoff. The average peak elevation was 2,890 feet above mean sea level. The water level then dropped steadily during the summer to a base level where it would remain until the following spring. Under Kerr Dam operations, however, the lake is raised to 2,893 feet (three feet higher than the average pre-dam peak) by June 15 each year, and is maintained at or close to this level through the summer and into the fall. The lake is then lowered gradually over the fall and winter months to 2,883 feet by April 15, at which point spring runoff begins the cycle anew. The dam was operated in substantially the same manner from 1938 to 2007. As described below, PPLM made a relevant change in procedure in 2007.

¶8     Landowners contend that MPC's and PPLM's practice of maintaining the lake at full pool (2,893 feet) has caused, and will continue to cause, substantial damage to their properties. They assert that the shoreline of Flathead Lake and the upper Flathead River is continuously being eroded and undercut by such operation of Kerr Dam, resulting in an "ever-widening footprint" of the lake. They explain that erosion is more severe during storms, that storms are stronger in the fall, and that the presence of higher-than-normal waves during fall storms produces substantial shoreline erosion and property damage. Thus, Landowners claim that most of the damage to their properties takes place in the fall when the lake is artificially held at or near 2,893 feet. They contend that this practice of keeping the lake at high levels into the fall storm season when shoreline erosion is most significant causes unreasonable and unnecessary damage to their properties.

¶9     There is no question that artificially maintaining the lake at full pool impacts shoreline properties. In fact, RMPC anticipated this. In a September 1937 letter to the

5

Federal Power Commission, RMPC stated that holding the lake at 2,893 feet for longer time intervals than those which typically prevailed under pre-dam conditions would "affect" lake borderlands and could, for instance, cause "waterlogging of lands beyond the conventional project boundary." A report issued by the Federal Energy Regulatory Commission in 1984 confirms this prediction. It states that because the lake, from about May through January, is held at high levels which formerly occurred naturally for only short periods (May through July), the delta and nearby islands at the head of the lake have suffered "high level erosion" and have been "progressively reduced in size." This is due to the fact that the shorelines in these areas "are now subjected to extended periods of wave erosion during times when they were formerly well above the lake level." MPC conducted its own study of shoreline erosion in the early 1990s, which revealed that the shoreline is retreating at several locations at the north end of the lake "in response to wind-generated waves at the higher water surface elevation." MPC's report states that this shoreline retreat is expected to continue as far as 2,100 feet inland on the east side and 1,640 feet inland on the west side before an equilibrium beach profile is reached. "Without intervention, wildlife habitat and developed lands such as the Eagle Bend golf course could be inundated within a few decades." A 1994 report prepared for MPC by Dr. Mark Lorang (who is now one of Landowners' consultants in the present litigation) likewise states that "[w]ave energy is the main physical forc[e] responsible for shoreline erosion in Flathead Lake." Dr. Lorang explains that the higher the lake level and the longer high lake levels are maintained, the more shoreline erosion. "Ultimately, future shoreline erosion on Flathead Lake will depend on how the lake level is regulated."

¶10 Dr. Lorang has been studying Flathead Lake since 1982, and has been studying shoreline erosion in particular since the mid-1990s. In his August 8, 2005 affidavit, he explains that the construction of Kerr Dam greatly altered the annual vertical distribution of wave energy, resulting in erosion and land loss across all shore lands except those composed of bedrock. He notes, in this regard, that property owners have invested in miles of seawall, revetment, and rip-rap construction along the shoreline of the lake, and that much of the undeveloped shoreline erodes away every year. Dr. Lorang has established study sites at various locations around the lake and found that shoreline retreat is most severe along the delta area of the river mouth located on the north shore of the lake. Annual land losses in that area are "on the order 40 to 50 feet." He found that land losses at other locations around the lake, due to elevated lake levels and wave erosion, varied between 1.5 feet and 12 feet annually. Notably, Dr. Lorang found nearly *zero* erosion in some of these areas in 2001, a particularly dry year when the lake did not reach and hold full-pool levels. In Dr. Lorang's opinion, a one-foot reduction of the lake level before the end of October each year "would dramatically reduce erosion lakewide that occurs during the fall storm season."

¶11 Prior to 2007, the average lake level as of November 1 each year was 2,892 feet. Starting in the fall of 2007, PPLM voluntarily implemented a procedure of lowering that level by one foot—i.e., down to 2,891 feet as of November 1. PPLM's stated purpose for doing this was to greatly reduce lakewide shoreline erosion in the fall.

¶12 Key to the parties' claims and defenses in this case is the fact that Landowners' properties are subject to flood easements, which RMPC and MPC obtained from

7

shoreline property owners in the 1930s, '40s, and '50s. These easements allow the operator of Kerr Dam to flood, subirrigate, drain, or otherwise affect shoreline properties with the waters of Flathead Lake. Landowners contend that MPC and PPLM have acted outside the scope of these easements by operating the dam "in a manner not reasonably necessary to the enjoyment of their rights, resulting in continuous erosion, property damage, and loss of shoreline on the plaintiffs' properties." Landowners assert claims of trespass, nuisance, a taking of property, and breach of the easements. MPC and PPLM, conversely, maintain that their operation of the dam has been within the scope of the easements and that they are not liable, therefore, for Landowners' claimed damages. This Court addressed the parties' differing views of the easement language in *Mattson II*. Our various interpretations of that language bear directly on the class-certification issue in the instant appeal and are explained in the Discussion section below.

¶13 Turning now to the class-certification proceedings, Landowners commenced this action on behalf of themselves and similarly situated landowners and filed motions to certify the lawsuit as a class action under Rule 23(a) and (b)(3) of the Montana Rules of Civil Procedure. The District Court granted the motions as to MPC in March 2001 and as to PPLM in July 2003. The court certified the following class:

> All persons and entities (other than Defendants and the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana) that own real property either with frontage on the shoreline of Flathead Lake in Flathead County or Lake County, Montana, or which contains a bank of the Flathead River located in Flathead County, Montana, or both.

¶14 In analyzing Landowners' motions for class certification, the District Court stated that it was "required to take the Plaintiffs' allegations in support of the class action as

8

true," citing *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177-78, 94 S. Ct. 2140 (1974). In its cross-appeal in *Mattson II*, PPLM argued that the District Court had erred in this respect. This Court agreed, concluding that the District Court had overread the *Eisen* decision. *Mattson II*, ¶ 64. Notably, the Supreme Court has recently confirmed this conclusion. *See Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2552 n. 6 (2011). Citing federal precedent as persuasive authority,[2] we observed that nothing in Rule 23 requires a district court to accept all of the complaint's allegations when deciding whether to certify a class. *Mattson II*, ¶ 65 (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001)). In fact, it may be necessary to look past the pleadings because " 'a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.' " *Mattson II*, ¶ 65 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996), and also citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372 (1982)). Thus, for purposes of analyzing a motion for class certification, we adopted the following guidelines:

> "(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in

---

[2] In interpreting and applying M. R. Civ. P. 23, Montana courts are not *required* to march lockstep with federal court interpretations of Fed. R. Civ. P. 23. We may consult and rely on federal precedent, however, to the extent it is persuasive.

making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Mattson II*, ¶ 67 (quoting *Miles v. Merrill Lynch & Co.*, 471 F.3d 24, 41 (2d Cir. 2006)).

¶15 Having concluded that the District Court applied an incorrect "take the Plaintiffs' allegations as true" standard, we vacated the District Court's July 2003 order certifying the class as to PPLM and remanded for reconsideration under the *Miles* guidelines. *Mattson II*, ¶¶ 67, 70. The District Court's March 2001 order granting class certification as to MPC had not been challenged in *Mattson II* and, thus, remained in force (for the time being).

¶16 On remand, Landowners filed a renewed motion for class certification as to PPLM. The parties briefed the issue, and the District Court held an evidentiary hearing in August 2010, at which time various witnesses testified and a number of exhibits were admitted. The District Court issued its findings of fact, conclusions of law, and order on June 16, 2011. The court concluded that Landowners had failed to establish all of the elements of Rule 23(a) and (b)(3), and the court thus denied their renewed motion to certify the class as to PPLM. Moreover, the court decertified the class as to MPC as well. The District Court's reasoning will be discussed below, where relevant.

**STANDARDS OF REVIEW**

¶17 We review a district court's decision on a motion for class certification for an abuse of discretion. *Chipman v. N.W. Healthcare Corp.*, 2012 MT 242, ¶ 17, 366 Mont.

10

450, 288 P.3d 193. The question under this standard is not whether this Court would have reached the same decision, but whether the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason. *Chipman*, ¶ 17. Of course, "[a] court abuses its discretion if its certification order is premised on legal error." *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001); *accord Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997) ("[T]he failure to follow the proper legal standards in certifying a class . . . is an abuse of discretion."). Likewise, "when a district court's decision is not supported by findings as to the applicability of Rule 23 criteria, it is not entitled to the traditional deference" given to determinations of class status. *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1161 (9th Cir. 2001) (internal quotation marks omitted). "To the extent that the ruling on a Rule 23 requirement is supported by a finding of fact, that finding, like any other finding of fact, is reviewed under the 'clearly erroneous' standard. And to the extent that the ruling involves an issue of law, review is *de novo*." *Miles*, 471 F.3d at 40-41. Thus, for example, "a ruling on numerosity, based on a finding of fact that is not clearly erroneous and with application of a legal standard that is correct, could be affirmed as within allowable discretion, in some circumstances, whether the ruling determined that this Rule 23 requirement was met or not met." *Miles*, 471 F.3d at 41.

## DISCUSSION

¶18   The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01, 99 S. Ct. 2545, 2557 (1979). Rule 23 of the Montana Rules of Civil Procedure

11

governs the propriety of a class action in Montana. The threshold inquiry into whether a class action is appropriate requires analysis of the four prerequisites set out in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Diaz v. Blue Cross & Blue Shield of Mont.*, 2011 MT 322, ¶ 27, 363 Mont. 151, 267 P.3d 756. These four requirements "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate" and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart*, 131 S. Ct. at 2550 (internal quotation marks omitted). Once the Rule 23(a) prerequisites are satisfied, the analysis shifts to Rule 23(b), which sets forth additional requirements depending on the type of class action being sought. *Diaz*, ¶ 27.

¶19 Landowners seek class certification under Rule 23(b)(3). Accordingly, they must satisfy the four criteria of Rule 23(a) and the two criteria of Rule 23(b)(3):

1. **numerosity:** the class is so numerous that joinder of all members is impracticable;

2. **commonality:** there are questions of law or fact common to the class;

3. **typicality:** the claims or defenses of the representative parties are typical of the claims or defenses of the class;

4. **adequate representation:** the representative parties will fairly and adequately protect the interests of the class;

5. **predominance:** the questions of law or fact common to the class members predominate over any questions affecting only individual members; and

6. **superiority:** a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

*See McDonald v. Washington*, 261 Mont. 392, 400, 862 P.2d 1150, 1154-55 (1993).

¶20 As to the first criterion (numerosity), the District Court observed that Landowners intend to include persons who have owned any shoreline of Flathead Lake or certain portions of the Flathead River since November 9, 1991. Counsel represented that as of 2002 or 2003, he was aware of 3,000 owners of shoreline or riverbank property. By including those who have owned any of the properties since November 1991, the District Court noted that the number of potential class members is "exponentially increased." The court ruled, therefore, that "the number of putative class members is sufficiently numerous." MPC and PPLM do not dispute this determination.

¶21 As to the third criterion (typicality), we have explained that this requirement is designed to ensure that the interests of the named representatives are aligned with the interests of the class members, the rationale being that a named plaintiff who vigorously pursues his or her own interests will necessarily advance the interests of the class. *Chipman*, ¶ 53; *McDonald*, 261 Mont. at 402, 862 P.2d at 1156. The District Court found that the named plaintiffs here, if they were to represent a class, would pursue their claims and advance those of the remaining class members. MPC and PPLM do not dispute this determination.

¶22 As to the fourth criterion (adequate representation), the requirements are that the named representatives' attorney be qualified, competent, and capable of conducting the litigation, and that the named representatives' interests not be antagonistic to the interests of the class. *Chipman*, ¶ 57; *McDonald*, 261 Mont. at 403, 862 P.2d at 1156. The District Court observed that despite the 11-year course of this lawsuit, Landowners have been represented by the same counsel, and there is no reason to believe that the same

counsel will not capably continue to do so. Furthermore, after striking four of the named plaintiffs as class representatives (on the ground that they have no ownership interest in the property which they contend is being damaged), the District Court found that the remaining named plaintiffs could fairly and adequately represent the interests of the proposed class. MPC and PPLM do not dispute this determination.

¶23 That leaves the second, fifth, and sixth criteria—commonality, predominance, and superiority, respectively—which are at the center of this appeal. Although the District Court separately analyzed each of these three requirements, the court noted that they are "quite inter-related" in the present case. Again, they require: that there are questions of law or fact common to the class; that the questions of law or fact common to the class members predominate over any questions affecting only individual members; and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Ultimately, the District Court ruled that these three requirements were not met for essentially one reason: the issue of whether MPC's and PPLM's operation of Kerr Dam caused unreasonable damage to, or interfered unreasonably with, shoreline properties "will vary drastically among the members of the class and will require an analysis on a property-by-property basis" considering such things as a given property's location, use, soil type, shoreline characteristics, erosional forces, and natural or manmade erosion controls. In this respect, it appears the District Court misconstrued our decision in *Mattson II* and thus based its class-certification decision on a premise that is both factually and legally incorrect. To understand why, it is necessary to explain our interpretations of the flood easements in *Mattson II*.

14

¶24 Although the language of the assorted easement contracts varies to some extent, they all grant MPC and its successors

> the perpetual right and easement for flooding, subirrigating, draining, or otherwise affecting with the waters of Flathead Lake and its tributaries all or any part of the hereinabove described lands which are, will or may be affected by the regulation and control of the waters of Flathead Lake by the construction, maintenance and operation of a dam and hydroelectric power development in the Flathead River below said lake, which dam is designed to control and regulate the waters of Flathead Lake at varying elevations, not exceeding a maximum controlled water level of 2893 feet, U.S.G.S. datum, at said dam.

This Court rendered four critical interpretations of this language in *Mattson II*.

¶25 First, we rejected Landowners' argument that the "2893 feet" clause creates a height limit or "contour line" around Flathead Lake at 2,893 feet, such that the dam operator may not allow the lake's waters to invade or affect any shoreline properties above this elevation. On the other hand, we also rejected PPLM's opposing argument that the dam operator has a boundless right to flood "the entire parcel" of every shoreline property owner. We instead interpreted the easements as follows:

> Taken as a whole, the easement language reflects that the grantors conveyed the right to flood, subirrigate, drain, or otherwise affect only that part of their parcels which may be "affected" when the water level of Flathead Lake is regulated at a maximum controlled elevation of 2,893 feet at Kerr Dam. Some parcels may be "affected" entirely when the water level is at this elevation, while others may not be "affected" at all. But again, the dam operator's right extends to only those parts of the parcels which are "affected" when the water level is at 2,893 feet at the dam. Hence, dam-related effects to the Landowners' properties which occur because the water level is regulated at the dam above an elevation of 2,893 feet would be beyond the scope of the easements.

*Mattson II*, ¶ 23 (footnote omitted). In this regard, we noted that the easement language contemplates that "all or any part of" a given shoreline parcel may be "affected" when

the water level is raised to an elevation of 2,893 feet at the dam. Therefore, while the water level may on occasion exceed 2,893 feet at other points around the lake, as Landowners claim, and while MPC and PPLM may have "affected" various shoreline properties at points on those properties above an elevation of 2,893 feet, as Landowners also claim, "such events are permitted by the easement language when the water level is regulated at the dam at an elevation of 2,893 feet or less." *Mattson II*, ¶ 24.

¶26    Second, Landowners argued that if the "2893 feet" clause were not interpreted as a vertical limit on the dam operator's right to use and affect shoreline properties, then the dam operator could expand the surface area of Flathead Lake indefinitely at the expense of shoreline property owners by undercutting and eroding away their properties. They asserted that such expansion has occurred over the past several decades and that, as a result, the 2,893-foot contour line around the lake is wider now than it was in the 1930s. Landowners maintained that their predecessors did not agree to this "ever-expanding taking" of shoreline property. *Mattson II*, ¶ 26. In this regard, Frank M. Kerr (RMPC's vice president and general manager) told these people prior to the construction of the dam: "If you will build or do anything on your property in the light of your experience as to what elevations of the lake have prevailed heretofore, you will in no way be affected by the new conditions." *See Mattson II*, ¶ 10. As noted, the lake's average pre-dam peak elevation was 2,890 feet, and the water level dropped steadily during the summer to roughly 2,882 feet, where it would remain until the following spring, whereas now the level is maintained at or near full pool (2,893 feet) from mid-June into early fall.

¶27　In light of these circumstances, we concluded that the property owners did not intend to grant, and the dam operator did not intend to obtain, "an unfettered right to sink their properties completely and permanently into the lake." *Mattson II*, ¶ 27. We agreed that any interpretation of the easement language under which shoreline property owners granted the dam operator the perpetual right to flood and erode their properties entirely, thereby rendering those properties permanently submerged and unusable for customary purposes, would be absurd—but only "insofar as Kerr Dam is operated unreasonably." *Mattson II*, ¶ 27. In this regard, we noted that RMPC and MPC did not guarantee, and the property owners could not reasonably expect, that there would be no damage at all to their properties resulting from the dam operator's exercise of its easement right over the years. Thus, we held that construing the "2893 feet" clause to be a limitation on the water level *at the dam*, as opposed to a limiting contour line *around the lake*, did not create an absurdity. Rather, construing the easement language to grant a right to use the Landowners' properties in a manner that is not reasonably necessary, or to cause unreasonable erosion and damage to those properties, would create the absurdity. *Mattson II*, ¶ 28. The crux of this holding is that *reasonable* damage caused to shoreline properties through *reasonable* operation of the dam is permissible under the easement contracts—a concept we elaborated upon in the next two points below.

¶28　Third, Landowners argued that the easement contracts do not allow the dam operator to cause "erosion" to shoreline properties. The relevant easement language grants "the perpetual right and easement for flooding, subirrigating, draining, or otherwise affecting" shoreline properties with the waters of Flathead Lake and its

17

tributaries. Of course, "eroding" is not listed, and we agreed with Landowners that the right to "erode" is not included in the term "otherwise affecting." *Mattson II*, ¶¶ 34-36. Nevertheless, based on the longstanding maxim that when an easement is created, every right reasonably necessary for its enjoyment is included by implication, *Mattson II*, ¶ 37, we concluded that because some "eroding" is inevitable in the course of perpetually flooding, subirrigating, and draining shoreline properties, a grant of the right to flood, subirrigate, and drain would be of no avail if it did not also include a grant of the right to erode, *Mattson II*, ¶ 38. "Hence, the right to cause some erosion is necessary to the enjoyment of the right to perpetually flood, subirrigate, and drain and, thus, is included by implication in the easements." *Mattson II*, ¶ 38. We further held, however, that the scope of the erosion right is defined as that which is "reasonably necessary" to the enjoyment of the express right to flood, subirrigate, and drain. *Mattson II*, ¶ 40. As such, the critical question with regard to erosion is whether the specific erosion of which the Landowners complain was and is "reasonably necessary." If reasonably necessary, then the erosion is within the easements. If not reasonably necessary, then the erosion is not within the easements. *Mattson II*, ¶ 40.

¶29 Fourth, and lastly, we adopted the separate but related rule that "unless clearly authorized by the terms of the servitude, the holder of an easement is not entitled to cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment." *Mattson II*, ¶ 47; *see also Restatement (Second) of Property: Servitudes* § 4.10 (2000). We concluded that this "is an independent requirement on an easement holder's use of the easement. In other words, this requirement can be breached even if the easement

18

holder is operating within the easement's technical parameters." *Mattson II*, ¶ 55. The underlying rationale for this rule is that

> the owner of a servient estate expects that the easement holder may do what is reasonably necessary to enjoy the servitude and, in the process, cause reasonable damage to her property, but does not expect the holder to inflict unreasonable damage or interference. . . . [W]e presume that the parties intended a fair balance of their interests and, to that end, intended the easement to be used in such a manner that unreasonable damage to or interference with the servient estate would not occur . . . .

*Mattson II*, ¶ 52. What this means for purposes of the present lawsuit is that while the dam operator may use shoreline properties in a manner that is reasonably necessary for the convenient enjoyment of its easements, the dam operator has a separate obligation not to cause unreasonable damage to the properties or interfere unreasonably with their enjoyment. *Mattson II*, ¶¶ 44, 55.

¶30    These reasonableness requirements are critical to the claims raised in this lawsuit, as there is nothing in the language of the flood easements expressly requiring the dam operator to lower the water level at particular times of year. The obligations to lower the lake to 2,883 feet by April 15 and to raise it to 2,893 feet by June 15 are contained in the *license* issued by the federal government. *Mattson II*, ¶ 11. The flood easements, on the other hand, specify a maximum elevation of 2,893 feet at the dam but do not expressly prohibit the dam operator from keeping the lake at that level year-round. Any obligation to lower the lake level exists by virtue of the reasonableness requirements which we held in *Mattson II* are implicit in the easement contracts.

¶31    In light of these interpretations of the flood easements, our decision in *Mattson II* made it clear that the parties' claims and defenses in this lawsuit boil down to two

19

interrelated questions: first, whether the erosion caused by MPC's and PPLM's operation of Kerr Dam has been reasonably necessary to the enjoyment of MPC's and PPLM's express right to flood, subirrigate, and drain shoreline properties, *Mattson II*, ¶ 40; and second, whether MPC and PPLM have caused unreasonable damage to, or interfered unreasonably with the enjoyment of, shoreline properties, *Mattson II*, ¶ 55. Importantly, we did *not* state in *Mattson II* that these questions should—or even could—be decided on a property-by-property basis. Indeed, short of negating the laws of physics, there is simply no way for the dam operator to maintain the water level at different elevations around the lake simultaneously. As Landowners correctly point out, "there is only one method of operating the dam that can be employed at one time," and it therefore would be impossible for the dam operator "to treat one plaintiff's property one way and another plaintiff's property a different way." Whatever elevation is selected, it applies to every shoreline property concurrently.

¶32 Correspondingly, the reasonableness of the selected elevation is not determined on an "individualized" basis, as the District Court incorrectly opined. Either the erosion being caused at various points around the lake at a chosen water level is reasonably necessary to the enjoyment of the express right to flood, subirrigate, and drain, or it is not. Erosion cannot be reasonably necessary at Yellow Bay and, at the same time, not reasonably necessary at the north shore. Likewise, damage cannot be reasonable in Big Arm and, at the same time, unreasonable in Polson Bay. Again, the dam operator can select only *one* water level at the dam, which is then applicable to the entire lake. And for this reason, while a particular elevation might seem unreasonable as to one shoreline

20

property considered in isolation, or even 20 properties considered together, this does not mean the dam is being operated unreasonably. To hold otherwise would make the dam operator hostage to the most geologically fragile shoreline property, which is not a reasonable interpretation of the flood easements.

¶33    Reasonableness in the present context "depends on the circumstances, such as the character of the servient estate, the purpose for which the servitude was created, and the use of the servient estate made or reasonably contemplated at the time the easement was created." *Mattson II*, ¶ 44. Although RMPC and MPC secured the flood easements on a property-by-property basis, every one of the easements had a common purpose: to enable the dam operator to regulate the waters of Flathead Lake up to a maximum elevation of 2,893 feet at the dam, and to correspondingly flood, subirrigate, drain, or otherwise affect *all* of the shoreline properties *simultaneously*. *Mattson II*, ¶ 14. Hence, the aggregate of the benefits and burdens imposed on *all* of the shoreline properties together, along with any regulatory and financial considerations applicable to the dam's operation, must be considered *as a whole* to determine whether the particular water level chosen by the dam operator at the particular time of year is reasonably necessary to its operation or is going to result in unreasonable damage to or interference with shoreline properties. Some properties may not be damaged at all, while others might suffer significant erosion, but the reasonableness of the water level cannot be determined on a property-by-property basis any more than the water level can be set on such a basis.

¶34    PPLM contends that "[w]hat may be reasonable to one [shoreline] property may be unreasonable to another [shoreline] property." For this proposition, PPLM cites

21

*Mattson*, ¶ 44 (what constitutes unreasonable damage and interference depends on the circumstances, such as the character of the servient estate, the purpose for which the servitude was created, and the use of the servient estate made or reasonably contemplated at the time the easement was created), and *Guthrie v. Hardy,* 2001 MT 122, ¶ 47, 305 Mont. 367, 28 P.3d 467 (what may be considered a reasonable use of a general easement is usually a question of fact to be determined in the light of the situation of the property and the surrounding circumstances). Contrary to PPLM's contention, however, a critical circumstance here is the fact that MPC and PPLM cannot operate the dam one way as to one shoreline property while operating it a different way as to another shoreline property. Reasonableness in this context, therefore, necessarily involves a balancing of myriad factors and competing interests relating to the regulation of the lake level—for example, the purposes for which the flood easements were created, the characteristics of all the servient estates, the interests of the shoreline property owners, the interests of the dam operator, any applicable government regulations, and any legal obligations the dam operator has to other entities or individuals (such as downstream water users). To illustrate this point, a jury theoretically could find that the extent of erosion occurring around the lake when it is maintained at 2,893 feet from mid-June to mid-September is reasonable when balanced against the recreational needs of shoreline property owners and businesses and the need to make the dam's operation feasible, but that the degree of erosion occurring when the lake is maintained at or near this elevation into October and November is unreasonable in light of these same factors or other factors, such as the increased intensity of fall storms.

22

¶35   Seen in this light, the District Court erred in concluding that there are no questions of law or fact common to the class under Rule 23(a)(2). At this point, it is necessary to acknowledge a recent divergence between the federal approach and Montana's approach to the commonality requirement. Under extant Montana caselaw, commonality " 'is not a stringent threshold and does not impose an unwieldy burden on plaintiffs.' " *Ferguson v. Safeco Ins. Co. of Am.*, 2008 MT 109, ¶ 26, 342 Mont. 380, 180 P.3d 1164 (quoting *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 667 (S.D. Ala. 2005)). Generally, Rule 23(a)(2) is given " 'a permissive application' " so that the commonality requirement is usually found to be satisfied. *McDonald*, 261 Mont. at 401, 862 P.2d at 1155 (quoting *Jordan v. Los Angeles County*, 669 F.2d 1311, 1320 (9th Cir. 1982)); *accord Chipman v. N.W. Healthcare Corp.*, 2012 MT 242, ¶ 47, 366 Mont. 450, 288 P.3d 193. We have said that commonality is satisfied when the question of law linking class members is substantially related to resolving the litigation, even though individuals may not be similarly situated, or when there is a common core of salient facts coupled with disparate legal remedies within the class. *Ferguson*, ¶ 23 (citing *Sieglock v. Burlington Northern & Santa Fe Ry. Co.*, 2003 MT 355, ¶ 11, 319 Mont. 8, 81 P.3d 495); *see also Chipman*, ¶ 47 (under our existing law, commonality is met when a single issue is common to all class members, regardless of differences among the class (citing *Ferguson*, ¶ 16, and *Diaz v. Blue Cross & Blue Shield of Mont.*, 2011 MT 322, ¶ 32, 363 Mont. 151, 267 P.3d 756)).

¶36   In contrast, the Supreme Court has "significantly tightened" the commonality requirement for purposes of federal Rule 23(a)(2). *See Chipman*, ¶¶ 47-49 (discussing *Wal-Mart*, 131 S. Ct. 2541). Under *Wal-Mart*, "the class members' claims must depend

23

on a common contention that is capable of classwide resolution, 'which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.' " *Chipman*, ¶ 48 (quoting *Wal-Mart*, 131 S. Ct. at 2551). " 'What matters to class certification . . . is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.' " *Wal-Mart*, 131 S. Ct. at 2551 (ellipsis and emphasis in original) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). In her partial dissent, Justice Ginsburg (with whom Justices Breyer, Sotomayor, and Kagan joined) argued that the *Wal-Mart* majority was erroneously blending Rule 23(a)(2)'s threshold commonality criterion with the more demanding predominance and superiority criteria of Rule 23(b)(3), and thereby elevating the Rule 23(a)(2) inquiry so that it is no longer easily satisfied. *Wal-Mart*, 131 S. Ct. at 2565-67. The dissenters argued that dissimilarities between class members and whether such individual differences impede common adjudication are more properly considered as part of the Rule 23(b)(3) inquiry, not the Rule 23(a)(2) inquiry. "The Rule 23(b)(3) predominance inquiry is meant to test whether proposed classes are sufficiently cohesive to warrant adjudication by representation. If courts must conduct a 'dissimilarities' analysis at the Rule 23(a)(2) stage, no mission remains for Rule 23(b)(3)." *Wal-Mart*, 131 S. Ct. at 2566 (dissenting opinion) (citation, brackets, and some internal quotation marks omitted). At the Rule 23(a)(2) stage, the dissenters argued, the question is not

what *distinguishes* individual class members, but what *unites* them. *Wal-Mart*, 131 S. Ct. at 2567.

¶37 The question arises as to whether Montana, which in the past has followed the lead of federal courts in class-certification analysis, should abandon its "permissive" approach to Rule 23(a)(2)'s commonality requirement in favor of the *Wal-Mart* majority's more stringent standard. In *Diaz*, we cited *Wal-Mart* in the context of our Rule 23(b)(2) analysis, but we did not do the same with respect to our Rule 23(a)(2) analysis. Instead, we applied Montana's longstanding law on commonality. *See Diaz*, ¶¶ 32-34, 42. In *Chipman*, we concluded that the plaintiffs satisfied the commonality requirement even under the more stringent *Wal-Mart* standard. We acknowledged that there were dissimilarities within the proposed class, but we emphasized what was *common* to the class: "common facts connect all class members in relation to the ultimate resolution of this dispute," and "[a] court's determination of whether a standardized group contract exists and the legal obligations of the parties will generate common answers applicable to all class members." *Chipman*, ¶ 52. It may be necessary in a future case—where the issue is properly briefed and argued, and the choice of one standard over the other is dispositive of the commonality inquiry—to decide whether Montana will retain its more permissive approach or instead adopt the *Wal-Mart* majority's approach. But in the present case, as we did in *Chipman*, we conclude that Landowners satisfy the more stringent standard in any event, because their claims "depend upon a common contention" which is "of such a nature that it is capable of classwide resolution"—i.e., the

"determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551.

¶38 The "common contention" is that MPC and PPLM have operated Kerr Dam unreasonably and caused unreasonable damage to shoreline properties. This contention is not merely "capable of classwide resolution," but is in fact *incapable* of being resolved on a property-by-property basis. As explained, the reasonableness of the dam's operation and resulting damage to shoreline properties depends on a balancing of many factors, one of which is the aggregate of the benefits and burdens imposed on *all* shoreline properties concurrently. Insofar as the flood easements are concerned, the dam's operation cannot simultaneously be reasonable and unreasonable. If, upon consideration of the factors bearing on MPC's and PPLM's decision to maintain the lake level at particular elevations at particular times of year, the trier of fact finds that the aggregate damage to, or interference with, shoreline properties is unreasonable, then MPC or PPLM is subject to liability for those damages. The amount of damages, of course, will then have to be determined on a property-by-property basis. *See Yokoyama v. Midland Natl. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (" 'The amount of damages is invariably an individual question and does not defeat class action treatment.' " (alteration omitted) (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975))); *accord McDonald*, 261 Mont. at 403-04, 862 P.2d at 1157 (" '[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.' " (emphasis omitted) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir.

26

1977))).  Conversely, if the trier of fact reaches the opposite finding (i.e., that MPC's and PPLM's choice of water levels has been reasonably necessary and has not unreasonably damaged the shoreline), then MPC and PPLM are not liable to any shoreline property owners—for the reason that the flood easements permit the dam operator to cause reasonably necessary erosion and reasonable damage to the servient estates when the water level is regulated at the dam at an elevation of 2,893 feet or less.  In short, on the question of MPC's and PPLM's liability, the shoreline property owners sink or swim together.  What this means, of course, is that the damage occurring at the north end of the lake, where erosion has been most pronounced, may actually be within the scope of the flood easements, and thus noncompensable, if it is resulting from *reasonable* operation of the dam.  But that is the nature of the easement right which Landowners' predecessors granted to RMPC and MPC.

¶39    For these same reasons, we further conclude that the question common to all class members' claims (the reasonableness of MPC's and PPLM's conduct) predominates over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

> The predominance inquiry focuses on the relationship between the common and individual issues and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  Rule 23(b)(3)'s predominance and superiority requirements were added to cover cases in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  Accordingly, a central concern of the Rule 23(b)(3) predominance test is whether adjudication of common issues will help achieve judicial economy.

*Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (ellipsis in original; citations, footnote, and internal quotation marks omitted). The matters pertinent to the predominance and superiority questions include (A) the class members' interests in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any litigation concerning the controversy already begun by or against class members, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (D) the likely difficulties in managing a class action. M. R. Civ. P. 23(b)(3)(A)-(D). In the present case, the first two of these factors have not been raised. The analysis has instead centered on the latter two factors.

¶40 The District Court observed that the properties around the lake differ in a variety of respects. They include wetlands, forests, floodplains, and river delta. Some have rock outcroppings or large natural boulders, while others have gravel beaches or bluffs. There are docks and boathouses built of varying materials, and seawalls and other shore stabilization projects of widely varying types. The types of soil also vary, as do the geographical alignments of the properties in relationship to wind and wave action. The court noted that the properties have been put to various uses—including farmland, townsites, marinas or yacht clubs, golf courses, private residences, lodge properties for hire by the public, and highway frontages. The court thus reasoned that "to determine whether erosion on each piece of property is unreasonable or interferes unreasonably with the landowner's enjoyment of the property, will necessarily evolve into a series of individual trials." PPLM makes this same argument on appeal. Yet, while it is true that the characteristics and uses of shoreline properties vary, all of the different characteristics

and uses must be considered *together*, in the aggregate, as part of the reasonableness inquiry.  This does not constitute a series of individual trials; it constitutes a balancing of numerous factual considerations in an overall assessment of what lake level is reasonable to maintain at any given time.

¶41    The only individual questions in this lawsuit relate to the amount of damages—if it is determined, first, that MPC and PPLM are liable for operating the dam unreasonably.  As noted above in ¶ 38, the fact that damages must be determined on an individual basis does not negate class certification as to *liability*.  *Yokoyama*, 594 F.3d at 1094; *McDonald*, 261 Mont. at 403-04, 862 P.2d at 1157; *see also* M. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.").  We hold that the predominance criterion is met.

¶42    Lastly, as to superiority, the District Court noted two factors.  First, the court again cited the proposition that reasonableness must be determined under an "individualized inquiry" based on "the uniqueness of the party's individual property and not the 3,000 properties (and the multiple owners of each of those properties) which the putative class desires to represent."  For the reasons already discussed at length above, this proposition is incorrect.  Second, the District Court observed that "there are a number of agencies and organizations with differing agenda which are impacted by the operation of Kerr Dam and/or have been created to express their interests in the operation of the dam."  The court listed some of them:  the Organization to Save Flathead Lake, Flathead Lakers, Flathead County, the Confederated Salish and Kootenai Tribes, the Montana Department of Fish, Wildlife and Parks, and the United States Fish and Wildlife Service.  The court

stated—without elaboration—that these entities "would not be heard in this litigation," which suggests that a single determination for all the properties owned by the proposed class Plaintiffs would not be superior to individual analyses." Yet, to the extent these entities *do not* have a legal stake in the operation of Kerr Dam, their views are irrelevant to this lawsuit anyway. Conversely, to the extent these entities *do* have an actual legal stake in the dam's operation, their interests bear on the issue of whether the dam is being operated reasonably and, as such, should be factored into the determination of that issue. In considering, then, whether it is preferable for these entities to present their interests in several thousand individual trials, or just one classwide trial, it seems obvious that the latter is far superior to the former. Accordingly, given the nature of the reasonableness issue underlying Landowners' claims—a question whose answer depends on a balancing of various competing interests—a class action is far superior, for purposes of fairly and efficiently adjudicating the controversy, to innumerable individual lawsuits.

## CONCLUSION

¶43 Based on the foregoing analysis, we hold that the six criteria for certification of a class action under Rule 23(a) and (b)(3) have been satisfied. Due to the legal errors in the District Court's analysis, as discussed above, we conclude that the District Court abused its discretion in decertifying the class as to MPC and in denying Landowners' renewed motion for class certification as to PPLM. We therefore reverse the District Court's order of June 16, 2011, and direct the court to certify the following class on remand:

> All persons and entities (other than the United States, the defendants, and the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana) that have owned real property at any time since November 9,

30

1991, either with frontage on the shoreline of Flathead Lake in Flathead County or Lake County, Montana, or which contains a bank of the Flathead River located in Flathead County, Montana, south of the point at which Lower Valley Road (east of U.S. Highway 93) intersects with the Flathead River, or both.[3]

Given this resolution of the appeal, it is unnecessary to address Landowners' argument (Issue 4 in their opening brief) that the District Court erred in failing to consider a portion of the evidence submitted by Landowners in support of class certification.

¶44 Reversed and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS

Justice Beth Baker, dissenting.

¶45 I dissent because the Court introduces confusion into our class certification standards and fails to accord proper deference to the District Court's role in deciding whether a case should proceed as a class action.

---

[3] This statement of the class is taken from Landowners' proposed findings of fact and conclusions of law filed in the District Court on August 23, 2010.

¶46    The Court points out that in *Mattson II*, we reversed the District Court's summary judgment ruling in favor of the Defendants and remanded for further factual development regarding two "interrelated" issues: first, whether Defendants made unreasonable use of the flood easements and second, whether Defendants caused unreasonable damage in the course of that use.  Opinion, ¶ 31.  While interrelated , the questions nonetheless are discrete, and were discussed as two separate issues in *Mattson II*.  *Mattson II*, ¶¶ 40, 43. In light of the conflicting evidence provided by the parties regarding both questions, we vacated the District Court's denial of Defendants' motion for an evidentiary hearing and ordered the District Court to consider evidence as required in evaluating the class certification criteria.  *Mattson II*, ¶ 67.  We stated the District Court's summary judgment ruling was erroneous due to "conflicting evidence regarding the kind and causes of erosion and the propriety of keeping the lake at full pool into the fall."  *Mattson II*, ¶¶ 41-42.  Adopting the rules of *Restatement (Third) of Property: Servitudes* § 4.10, we held that Defendants also could incur liability independently of the flood easements for unreasonable damage to, or interference with, Plaintiffs' properties.  *Mattson II*, ¶ 52.  In other words, even if keeping the lake at full pool in October fell "within the easement's technical parameters," MPC and its successors had "a separate obligation not to cause unreasonable damage to the properties or interfere unreasonably with their enjoyment." *Mattson II*, ¶ 55.

¶47    We directed the District Court on remand to reconsider its class certification decision by considering and resolving "factual disputes relevant to each Rule 23 requirement" and by following the additional guidelines we adopted from the Second

Circuit's decision in *Miles*. *Mattson II*, ¶ 67. The District Court followed these instructions by holding an evidentiary hearing and considering the conflicting evidence in re-evaluating the class certification criteria. It stated accurately that *Mattson II* required evaluation for class certification purposes of whether the Defendants "caus[ed] unreasonable damage to the properties or interfer[ed] unreasonably with the landowners' enjoyment of their properties, or both." The District Court provided a detailed summary of the evidence in forty-seven findings of fact on which it relied in determining that Plaintiffs had not satisfied the Rule 23 requirements. It noted that adjudication of whether Defendants' easement use was reasonable required evaluation of numerous factors and that there were drastic factual variations between the 3,000-plus properties:

> 31. The easements at issue herein were created over an approximately twenty-year period of time and they cover properties that span miles and miles of shoreline on the Flathead Lake and Flathead River. They consist, in part, of farm land; town sites; marinas or yacht clubs; golf courses; private residences; lodge properties for hire by the public; highway frontages; boat docks, boathouses, and piers built of varying materials; seawalls and other shore stabilization projects of widely varying types. . . . The natural characteristics of the properties include wetlands, forests, floodplains, river delta, rock outcroppings, large natural boulders, gravel beaches, bluffs, and varying types of soil and soil characteristics. . . . The properties are situate[d] along the north lake shore, where most of the big waves break due to the prevailing wind . . . the south shore which is quite shallow and the waves are not impacted by the dominant wind pattern, the east and west shores which differ significantly from each other and from the north and south lake shores, and along the lower Flathead River.

Due to these variations, as well as other considerations relevant to the "reasonableness" inquiry, the District Court determined that Plaintiffs had not satisfied the requirement of a common question of law or fact that predominated over individual differences, and also failed to show that a class action was the superior mode of adjudication. M. R. Civ. P.

23(a)(2), (b)(3). The District Court concluded that evaluation of the lake level's impact on all of the properties inevitably would require individualized trials to determine Defendants' liability, making a class action overly complicated and uneconomical.

¶48 We review the District Court's determination of the Rule 23 class certification criteria for an abuse of discretion and reverse only if the District Court "acted arbitrarily without conscientious judgment or exceeded the bounds of reason." *Chipman*, ¶ 17 (citations omitted). "Trial courts have the broadest discretion when deciding whether to certify a class." *Sieglock*, ¶ 8 (citing *McDonald*, 261 Mont. at 399, 862 P.2d at 1154). The District Court's judgment must be "accorded the greatest respect because it is in the best position to consider the most fair and efficient procedure for conducting any given litigation." *Chipman*, ¶ 17 (citations omitted). *Miles*, on which the Court purports to rely, makes clear that while factual findings are reviewed for clear error and legal conclusions de novo, the abuse of discretion standard nonetheless applies to each certification criterion, as well as to the court's final decision on certification. *Miles*, 471 F.3d at 32, 40-41. The Court reverses as to each of three certification criteria— commonality, predominance and superiority—because the District Court's interpretation of our holding in *Mattson II* was "incorrect"; but the Court does not specify how the District Court misinterpreted that precedent or identify error in any of the District Court's factual determinations. The Court notes, "[i]mportantly, we did *not* state in *Mattson II* that these questions should—or even could—be decided on a property-by-property basis," Opinion, ¶ 31; however, the question whether individual trials would be necessary was a determination for the District Court to make on remand. *Mattson II*, ¶ 68

34

(remanding for factual development and determination of the Rule 23 criteria). In my view, the Court has disregarded the role of the fact-finder and failed to apply the proper standard of review.

¶49 The Court provides only one reason for reversing the District Court's determination of the commonality, predominance and superiority requirements: Defendants can operate the dam to effectuate only one lake level at a time and thus, "[e]ither the erosion being caused at various points around the lake at a chosen water level is 'reasonably necessary' to the enjoyment of the express right to flood, subirrigate, and drain, or it is not." Opinion, ¶ 32. Rather than clarify where the District Court erred in deciding each criterion, this Court merely reiterates that dam operators cannot "operate the dam one way as to one shoreline property while operating it a different way as to another shoreline property." Opinion, ¶ 34.

¶50 The District Court acknowledged that the lake could be operated at only one level, but determined that Plaintiffs failed to show Rule 23(a)(2) commonality because of the myriad sub-issues arising in evaluating "reasonableness" of the lake level with respect to the wide range of servient estates:

> 28. The only element Plaintiff has established as common to all members of the class is Defendants' "decision to hold the lake level high into the fall storm season." . . . The evidence demonstrates that the issue of whether Defendants' operation of the dam caused damage or interference with each proposed class member's property, and particularly <u>unreasonable</u> damage or <u>unreasonable</u> interference, will vary drastically among the members of the class and require an analysis on a property-by-property basis of the nature of the property, such as soil type; natural or manmade erosion controls; the location of the property; natural characteristics of the shoreline; the use and enjoyment to which the landowner puts the property; and the ordinary, anticipated impacts on the properties from Defendants'

35

reasonably necessary enjoyment of their easement rights. There is significant differentiation between the erosional force, from the operation of the dam and from other causes, at work in the Flathead River and those in Flathead Lake. The Plaintiffs have not suggested how they will establish the amount of erosion or the causes thereof along the Flathead River, or how the unreasonableness of any erosion in the river attributable to the operation of Kerr Dam will be established. The Court must find from the available evidence that individualized determinations will be mandated, suggesting that there is not a significant common "core of salient facts" among all class members sufficient to find that there are questions of fact or law common to the class.

(Emphasis in original.) Importantly, the District Court also recognized that a class-wide decision on the reasonableness of Defendants' dam operation would not dispose of the question of Defendants' liability to all Plaintiffs such that only individualized damages would need to be proven:

34. This is not a question of the differing extent of each property owner's damages as Plaintiff contends, which does not necessarily defeat class certification. The Montana Supreme Court ruled that liability may only be imposed if it is found that "MPC and PPLM caused erosion that was not reasonably necessary to the enjoyment of their rights thereunder, by causing unreasonable damage to the properties or interfering unreasonably with the landowners' enjoyment of their properties, or both." . . . Therefore, all of the considerations that enter into a resolution of conflicts over the extent of an easement . . . must be evaluated as an element of Plaintiffs' claims.

(Emphasis in original.) This is precisely what we said in *Mattson II*. *Mattson II*, ¶ 69. The District Court's observation, after hearing the evidence, that there were numerous potential causes of the erosion present on individual Plaintiffs' properties leads to the conclusion that, if Defendants are to be found liable to the entire class, causation would need to be shown on an individualized basis. The District Court followed *Mattson II* by relying on *Restatement (Third) of Property: Servitudes* § 4.10, comment (c) of which

36

states: "The uses that are reasonably necessary for enjoyment of an easement change over time[.] . . . [Such] conflicts frequently present difficult factual issues as to how broadly or narrowly the purpose should be defined[.] . . . Resolution of the conflict often demands a detailed inquiry into the particular facts and circumstances of the case, and the issues as to intent, reasonable expectations, purpose, reasonableness of use, and extent of damage and interference are usually intertwined." In *Mattson II*, we listed numerous cases that followed "the reasonableness standards set forth in *§ 4.10*," and that held that a defendant's liability for breach of an easement must be proven based on the facts and circumstances of the case. *Mattson*, ¶ 47 ("[t]he law requires that [the easement holder's] use of the easement not unreasonably burden the servient tenement.") (quoting *Sampson v. Grooms*, 230 Mont. 190, 195, 196, 748 P.2d 960, 963, 964 (1988)).

¶51    Based on authorities cited in *Mattson II*, the District Court concluded that "no definite rule can be stated as to what may be considered a reasonable use of an easement as distinguished from an unreasonable use; rather, the question is usually one of fact to be determined in the light of the situation of the property and the surrounding circumstances." It follows that Defendants' *liability* turns on the fact-based evaluation of reasonableness with respect to each property. The District Court recognized that *Mattson II* required additional factual development under two separate theories in order to determine whether Defendants would be liable for unreasonable erosion. *Mattson II*, ¶¶ 42, 56. The legal authorities and instructions we provided in *Mattson II* became the law of the case, "which must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal." *Hafner v. Conoco, Inc.*, 1999 MT 68, ¶ 20,

293 Mont. 542, 977 P.2d 330 (quoting *Marriage of Scott*, 283 Mont. 169, 175-76, 939 P.2d 998, 1002 (1997)).

¶52 The Court now presumes without explanation that class adjudication of the "reasonableness" of dam operation disposes of the question of liability to all class members, such that the class complaint satisfies Rule 23(a)(2)'s requirement of a common answer. The Court simply asserts, "[t]he only individual questions in this lawsuit relate to the amount of damages—if it is determined, first, that MPC and PPLM are liable for operating the dam unreasonably." Opinion, ¶ 41. During oral argument before this Court, however, Plaintiffs' counsel conceded that adjudication of the "reasonableness" of Defendants' dam operation would not necessarily dispose of the question of Defendants' liability because Plaintiffs still could pursue claims under *Mattson II*'s "second question":

> THE COURT: Coming back to your discussion of the disjunctive test, question one and question two, and I think your argument is that you think question one is the common question that could be tried as a class. . . . I'm envisioning how that would play out if you did try that first issue as a class and Montana Power would come into the trial and introduce all the evidence where a lot of these properties had not been damaged and there was no erosion and the jury concludes that . . . the power companies' use of the dam, maintenance of the dam, was reasonable—we hold in favor of the defendant on this first question. That doesn't end the liability claims for the property owners, does it? They would still have a claim under the second question, wouldn't they?

> COUNSEL: That's correct, because it is disjunctive . . . you're absolutely right. If the test is disjunctive and I think it's just clear that it is . . . then intellectual honesty would say that it's one or the other, doesn't have to be both—could be both, of course.

This exchange reflects our holding in *Mattson II* and confirms that, even if a jury rules in favor of MPC and PPLM, Plaintiffs still could bring individual actions challenging the effect of the lake level on their own properties. For the same reason, if the jury finds in favor of Plaintiffs on the question of breach of easement, individual Plaintiffs *also* may pursue their alternative claims of trespass, nuisance, and a taking of their properties, potentially resulting in thousands of separate suits against Defendants. Thus, there are multiple grounds for concluding that Plaintiffs' question does not generate a common answer "that will drive the resolution of the litigation." *Chipman*, ¶ 52. Individualized proof of liability still will be necessary and, regardless of what the jury decides regarding the first question, Plaintiffs may pursue individual actions for unreasonable interference and property damage arising from Defendants' use of their easements.

¶53 Rather than address these and other concerns that the District Court emphasized in evaluating commonality, the Court questions whether Rule 23(a)(2) even requires a common answer in Montana. Opinion, ¶ 37. I disagree that the "question arises" in this case, since we resolved it in *Chipman*. As we recognized there, the United States Supreme Court's *Wal-Mart* decision heightened the burden of federal class action plaintiffs in demonstrating commonality under Fed. R. Civ. P. 23(a)(2). The class complaint must include not only a common question of law or fact—plaintiffs must additionally demonstrate that there are "common *answers* apt to drive the resolution of the litigation." *Chipman*, ¶ 48 (quoting *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2551). (Emphasis in original.) We characterized our previous cases as the law Montana followed "[p]rior to *Wal-Mart*," *Chipman*, ¶ 47, and unequivocally adopted the more

39

stringent standard, emphasizing "this Court's long history of relying on federal jurisprudence when interpreting the class certification requirements." *Chipman*, ¶ 52; *see also Mattson II*, ¶¶ 64-67 (following "the approach of the federal courts" and citing cases). We agreed that "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers," *Chipman*, ¶ 48, but decided that adjudication of the class plaintiffs' question in that case—"whether a standardized group contract exists and the legal obligations of the parties"—would generate a common answer that disposed of the central issue for all class members in one stroke. *Chipman*, ¶ 52. Importantly, *Chipman* involved only a claim for declaratory relief and thus we did *not* address the additional certification prerequisites for class damages claims—superiority and predominance. *Chipman*, ¶ 59.

¶54 Citing *Chipman*, the Court now states that the question "whether Montana will retain its more permissive approach or instead adopt the *Wal-Mart* majority's approach" may be resolved in "a future case." Opinion, ¶ 37. The Court discusses and quotes the opinion of *Wal-Mart*'s dissenting justices who disagreed with the Supreme Court's adoption of the heightened commonality threshold—ignoring our clear application of the *Wal-Mart* standard in *Chipman*. Opinion, ¶ 36. These statements on the heels of *Chipman* muddle Montana's class action law rather than provide any clarity or guidance to the district courts and the practicing bar. *See e.g.* Robert H. King, Jr., *Four Lessons from* Wal-Mart v. Dukes *and Their Application to Montana Class Action Law*, 73 Mont. L. Rev. 255, 284 (Summer 2012) (suggesting that the question whether Montana courts will adopt the *Wal-Mart* commonality standard has not been resolved but that the courts

"should follow" *Wal-Mart*) *and* Robert H. King, Jr., *Update to Previously Published Article*, 38 *Montana Lawyer* 7 (Dec./Jan. 2012) (reporting that *Chipman* "affirmatively resolved" the question of Montana's commonality standard by adopting the heightened commonality threshold of *Wal-Mart*). Despite *Chipman*'s unequivocal language, it is now unclear what prospective class plaintiffs must demonstrate in order to meet the Rule 23(a)(2) commonality requirement.

¶55 Whether or not the commonality factor is met, the Court further disregards the deference owed the District Court's determinations of the Rule 23(b)(3) requirements of predominance and superiority, which grant the trial court broad authority to evaluate the overall suitability of a case for class adjudication. A court's evaluation of predominance is "pragmatic" because the court weighs common issues against non-common issues in determining the most efficient mode of adjudication. Newberg et al., *Newberg on Class Actions* § 4:51, 200 (5th ed., Thompson/West 2011). Plaintiffs must meet a higher burden in showing predominance than in demonstrating a common question of law or fact. Newberg, *Newberg on Class Actions* § 4:51, 198 (as a general rule, "[t]he predominance demand is stricter than Rule 23(a)(2)'s commonality requirement"). A prospective class seeking money damages may be certified under Rule 23(b)(3) only if:

> the court finds that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against the class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

M. R. Civ. P. 23(b)(3). These considerations are "a nonexhaustive list of factors pertinent to a court's 'close look' at the predominance and superiority criteria." *Amchem Prods. v. Windsor*, 521 U.S. 591, 615-16, 117 S. Ct. 2231, 2246 (1997); *see McDonald*, 261 Mont. at 404, 862 P.2d at 1157 (discussing the 23(b)(3) factors). Considering the substantial amount of evidence presented, the District Court determined that the individual variations between the Plaintiffs' properties outweighed their proposed common question. It concluded:

> 33. An attempt to evaluate in a class action setting the differing characteristics of all class members' properties, the uses made of the properties at the time the easements were created, over time and today, and the locations of the properties, to determine whether erosion on each piece of property is unreasonable or interferes unreasonably with the landowner's enjoyment of the property, will necessarily evolve into a series of individual trials.

¶56 The preliminary factual development of this case documented in the District Court's decision supports its conclusion that a class action would be unmanageable and that "[c]lass certification will complicate rather than economize resolution of these issues." The court also reasoned that requiring individual trials would not result in multiple lawsuits arising out of the same set of facts and questions of law because "there are some properties owned by proposed class members that are not actually experiencing erosion" and further, because *Mattson II*'s second question would inevitably require additional individual suits.

42

¶57 The Court fails to explain how one trial requiring fact-specific evaluation of the dam's effects on 3,000 different properties over time will not evolve into a series of separate trials. The Court states:

> all of the different characteristics and uses must be considered *together*, in the aggregate, as part of the reasonableness inquiry. This does not constitute a series of individual trials; it constitutes a balancing of numerous factual considerations in an overall assessment of what lake level is reasonable to maintain at any given time.

Opinion, ¶ 40. (Emphasis in original.) The Court does not disagree that the question of "reasonableness" presented here will require case-by-case analysis of a multitude of factors, but simply instructs the District Court to evaluate those factors in the context of one lawsuit—a task the District Court found to be unmanageable under the specific circumstances of this case. The trial court is uniquely positioned to make that determination and is entitled to considerable deference in matters of trial administration. *Fink v. Williams*, 2012 MT 304, ¶ 18, ___ Mont. ___, ___ P.3d ___. This is particularly so when reviewing a district court's determination of superiority, which involves comparison of class litigation to procedural alternatives, including "multiple individual actions, joinder of claims, the use of test cases, and administrative procedures, among others." Newberg, *Newberg on Class Actions* § 5:25, 473.

¶58 Finally, the District Court could consider, if "appropriate," certification of the "particular issue" whether Defendants made unreasonable use of the flood easements, as allowed by M. R. Civ. P. 23(c)(4). *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (providing that, where appropriate, trial court may proceed with class treatment with respect to "particular issues" under Fed. R. Civ. P. 23(c)(4)(A), even

if certification of the entire action is not warranted). That is a matter I would leave open for the parties and the District Court to consider, since the record does not show that the Plaintiffs made such a request.

¶59 The District Court followed our directive in *Mattson II* to reconsider the certification criteria after providing the opportunity for further factual development of the two issues we identified. Its determination of each of the Rule 23 criteria was based on application of the legal principles provided in *Mattson II* to the evidence developed during the hearing. Having sent the case back to the District Court for fact-finding, I would defer to its thorough analysis of the evidence and conclude that the District Court did not abuse its discretion in denying class certification in this case. I dissent from the Court's failure to do so.

/S/ BETH BAKER

Justice Jim Rice joins in the dissenting Opinion of Justice Baker.

/S/ JIM RICE